# United States Tax Court

166 T.C. No. 8

VARIAN MEDICAL SYSTEMS, INC. AND SUBSIDIARIES,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 8435-23.                                    Filed April 8, 2026.

————

In *Varian Med. Sys., Inc. & Subs. v. Commissioner*, 163 T.C. 76 (2024), we held that P was entitled to a deduction under I.R.C. § 245A for amounts treated as dividends (DRD) under I.R.C. § 78 for P's 2018 tax year. We further held that I.R.C. § 245A(d)(1) would disallow P's foreign tax credits to the extent they were attributable to amounts P properly treated as dividends under I.R.C. § 78 and deducted under I.R.C. § 245A.

Now before us are Cross-Motions for Summary Judgment pertaining to the computation, for the 2018 tax year, of P's DRD under I.R.C. § 245A and disallowed foreign tax credits under I.R.C. § 245A(d)(1). Specifically, P maintains that (1) as a procedural matter, R is precluded from arguing that I.R.C. § 246 disallows a portion of P's claimed DRD under I.R.C. § 245A because the argument comes too late; (2) as a substantive matter, I.R.C. § 246 allows P's claimed DRD in full; and (3) the formula used to compute P's foreign tax credit disallowance under I.R.C. § 245A(d)(1) must include a pre-I.R.C. § 965(c) amount in the denominator of the fraction. R disagrees with P on each point and contends that P's arguments regarding I.R.C. § 245A(d)(1) come too late.

**Served 04/08/26**

*Held*: The Court will not treat R as having forfeited his argument concerning I.R.C. § 246 or P as having forfeited its argument concerning I.R.C. § 245A(d)(1).

*Held, further*, I.R.C. § 246 disallows a portion of P's DRD under I.R.C. § 245A.

*Held, further*, the formula used to compute P's foreign tax credit disallowance under I.R.C. § 245A(d)(1) must include the post-I.R.C. § 965(c) amount in the denominator of the fraction.

*Held, further*, R's Motion will be granted, and P's Motion will be denied.

————————

*Jean A. Pawlow*, *Eric J. Konopka*, and *Alexandra B. Clionsky Kelly*, for petitioner.

*Andrew M. Tiktin*, *Meenu Kapai*, and *H. Clifton Bonney, Jr.*, for respondent.

OPINION

TORO, *Judge*:  In *Varian Medical Systems, Inc. & Subs. v. Commissioner*, 163 T.C. 76 (2024) (reviewed), the Court addressed two issues of first impression, both related to provisions of the Tax Cuts and Jobs Act (TCJA), Pub. L. No. 115-97, 131 Stat. 2054 (2017).

First, we considered two of the TCJA's effective date provisions, one that established when a new Code[1] provision (section 245A) would take effect and another that established when changes to a preexisting Code provision (section 78) would take effect.  We agreed with petitioner, Varian Medical Systems, Inc. (Varian), that the two effective date provisions created a mismatch, the terms of which had to be respected. As a result, we held that, for certain taxpayers, new section 245A

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts have been rounded to the nearest dollar.

operated in tandem with the pre-TCJA version of section 78 for a time. Varian was one such taxpayer. Therefore, for its 2018 tax year, we concluded that Varian was entitled to a deduction under section 245A related to gross-up amounts it included in income as a dividend under the prior version of section 78.

Second, we considered whether, in view of our first holding, new section 245A(d)(1) limited the amount of foreign tax credits Varian would be entitled to claim. On this issue, we agreed with the Commissioner and held that Varian's foreign tax credits would be limited.

After we issued the opinion, Varian and the Commissioner worked to compute Varian's deduction under section 245A and its disallowed foreign tax credits under section 245A(d)(1). Now before us are Cross-Motions for Summary Judgment addressing disputes that arose during that process. Both parties argue that we should deem certain points raised by the Motions forfeited or abandoned because the other party did not raise them earlier.

For its part, Varian maintains that the Commissioner has forfeited any argument that section 246 disallows a portion of Varian's claimed deduction under section 245A, and, in any event, section 246 allows Varian's claimed deduction in full. Varian further contends that, in determining the amount of its foreign tax credit disallowance under section 245A(d)(1), Varian's net section 965 inclusion must be determined without regard to section 965(c).

The Commissioner disagrees with Varian on each of its three points. Additionally, the Commissioner maintains that Varian has forfeited any arguments regarding the section 245A(d)(1) disallowance.

For the reasons below, we will not treat the parties' arguments as forfeited and resolve the remaining issues in favor of the Commissioner.

*Background*

The following facts are derived from the parties' pleadings and Motion papers.[2] They are stated solely for the purpose of ruling on the

---

[2] Many of these facts were included in our prior opinion. We repeat them here for the reader's convenience.

Motions before us and not as findings of fact in this case. *See Rowen v. Commissioner*, 156 T.C. 101, 103 (2021) (reviewed).

Originally founded in 1948, Varian is the parent company of a consolidated group of medical device and software manufacturers. Its principal place of business is in Palo Alto, California.

Varian operates through corporations in many different countries, at least some of which are controlled foreign corporations (CFCs) as that term is defined in section 957(a). Varian and its CFCs are fiscal year taxpayers, meaning their taxable years do not end on December 31. *See* I.R.C. § 441(a), (d), (e). As relevant for this case, the fiscal year of Varian and its CFCs started on September 30, 2017, and ended on September 28, 2018 (2018 Year).

During the 2018 Year, 22 CFCs owned directly and indirectly by Varian and members of its U.S. consolidated group had Accumulated Post-1986 Deferred Foreign Income, as defined in section 965 and the regulations thereunder. Shares in nine of those CFCs were held directly by a member of Varian's U.S. consolidated group (first-tier CFCs). Shares in the remaining 13 CFCs were held indirectly (i.e., through one or more foreign corporations) by a member of Varian's U.S. consolidated group (lower tier CFCs).

Varian filed a consolidated federal income tax return for the 2018 Year. On the return, Varian elected to claim foreign tax credits for foreign taxes that it was deemed to pay under section 960 and was therefore required to "gross up" its taxable income under section 78 by reporting a dividend of approximately $159 million. Varian also claimed a deduction of approximately $60 million under section 245A in connection with the dividend it was treated as receiving under section 78 from its first-tier CFCs.

The Commissioner examined Varian's tax return and issued Varian a Notice of Deficiency in which, among other things, he disallowed Varian's claimed deduction under section 245A. The Commissioner also increased Varian's section 78 dividend by nearly $1.9 million.[3] The Commissioner further determined, in the alternative, that if Varian was entitled to deduct its section 78 dividend under section 245A, then "I.R.C. § 245A(d) would disallow any foreign tax

---

[3] Varian does not dispute this adjustment.

credits attributable to that amount. Accordingly, [Varian's] foreign tax credits [would] be reduced by approximately $6,362,356."

Varian timely petitioned our Court for a redetermination of the Commissioner's determinations. In its Petition, Varian alleged that the disallowance of its section 245A deduction was erroneous. Varian also alleged for the first time that it is entitled to additional section 245A deductions (on top of those claimed in its return) of approximately $100 million, primarily related to the portion of its section 78 dividend arising from its lower tier CFCs. The parties filed Cross-Motions for Partial Summary Judgment regarding Varian's entitlement to a deduction related to its section 78 dividend and to the potential foreign tax credit disallowance under section 245A.

In August 2024, we issued our prior opinion, holding that Varian was entitled to a deduction under section 245A and that its foreign tax credits would be commensurately reduced by section 245A(d). *Varian*, 163 T.C. at 112. After working to compute the relevant amounts, Varian and the Commissioner filed the Cross-Motions for Summary Judgment now before us.

## *Discussion*

### I. *Summary Judgment Standard*

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Rule 121(a)(2); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the adverse party. *Sundstrand Corp.*, 98 T.C. at 520.

The parties generally agree with respect to the relevant facts, and there is no dispute that we may resolve their Motions as a matter of law.

### II. *Section 246*

Sections 243, 245, and 245A all allow corporations, in certain circumstances, to deduct dividends they receive from other corporations. Section 243(a) generally authorizes a deduction for a portion of the

dividends received from domestic corporations. Section 245(a)(1) authorizes a deduction for the "U.S.-source portion" of dividends received from "qualified 10-percent owned foreign corporation[s]." And section 245A, as we have discussed at length, authorizes a deduction for the "foreign-source portion" of dividends received from "specified 10-percent owned foreign corporation[s]."

Section 246 sets out certain rules that limit the deductions available to taxpayers under those three provisions. Relevant here are the holding periods provided in section 246(c). Specifically, section 246(c)(1) provides that "[n]o deduction shall be allowed under section 243[,] 245, or 245A, in respect of any dividend on any share of stock . . . which is held by the taxpayer" for fewer than a specified number of days within a defined window that straddles the "ex-dividend" date.[4] For purposes of section 245A deductions, section 246(c)(5) modifies the holding period: Paragraph (5)(A) increases the period's duration and paragraph (5)(B) establishes that ownership thresholds set by section 245A must also be maintained at all times during the period.

There is no dispute that the shares of Varian's first-tier CFCs were held by a member of Varian's U.S. consolidated group for the time required by section 246(c)(1), as modified by section 246(c)(5). Thus, the parties agree that the holding period was satisfied for those CFCs.

With respect to the lower tier CFCs, however, the Commissioner points out that the shares were at all times held by intermediate foreign corporations. In the Commissioner's view, "the taxpayer" (i.e., Varian, or a member of its U.S. group) did not hold the shares at all. As a result, he says, the holding period is not satisfied, and Varian cannot claim the deduction with respect to its lower tier CFCs. Varian disagrees and further contends that the Commissioner has forfeited the argument by raising it too late. We address Varian's forfeiture claim before turning to the merits.

---

[4] The ex-dividend date is "[t]he date on or after which the buyer of a security does not acquire the right to receive the recently declared dividend." *Ex-Dividend Date, Black's Law Dictionary* (12th ed. 2024). The parties do not seem to dispute that the section 78 dividends at issue are deemed paid to the U.S. shareholder on the last day of the CFC's taxable year. *See* I.R.C. § 951(a)(1); Treas. Reg. § 1.78-1(d)(2).

A.   *Abandonment or Forfeiture*

Varian asserts that the Commissioner should have raised his argument under section 246(c) earlier and that he is now precluded from advancing it.  In particular, Varian says, the Commissioner made no argument regarding section 246 in the Motion papers that led to our prior opinion.  And, at the oral argument we held before the opinion was issued, the Commissioner was silent even though we asked Varian's counsel about section 246, and Varian's counsel replied that the Commissioner "doesn't say anything" about it.  Hr'g Tr. at 44.

Varian also highlights language from our prior opinion.  Specifically, the opinion recognized that Varian's claimed deduction related to a section 78 dividend of approximately $160 million, attributable to Varian's first-tier and lower tier CFCs.  The opinion held that "section 245A and section 78, read together, authorize Varian to deduct its section 78 dividend for the 2018 Year." *Varian*, 163 T.C. at 89.  The opinion further stated that "no other provision in effect for that year disallows the deduction," *id.*, and that "[t]here is no dispute in this case that Varian satisfied the relevant holding period," *id.* at 86 n.8.

Varian contends that, if the Commissioner disagreed with these statements, he should have filed a Motion for Reconsideration.  Having failed to do so, Varian says, he cannot now bring his challenge.

For his part, the Commissioner begins by noting that Varian's prior Motion was for *partial* summary judgment only and section 246 was not within its scope.  He then asserts that Varian's prior Motion was focused on the effective date issue, which, if it had been decided in the Commissioner's favor, would have precluded the deduction entirely.  As a result, the Commissioner says, his objection focused on the same point and did not address how the deduction would be computed if it were allowed.  The Commissioner further notes that, in his Answers to Varian's Petition and Amended Petitions, he has consistently denied Varian's assertion that the section 246 holding period was satisfied.

Varian's points are well taken.  Varian moved for partial summary judgment that it "was entitled to deduct its section 78 dividends under section 245A during the 2018 . . . Year, and that Treas. Reg. § 1.78-1 d[id] not preclude that result."  Pet'r's Mot. for Partial Summ. J. iii.  In response, the Commissioner had every opportunity to raise his section 246 position—which, if we accept it, will disallow almost two-thirds of Varian's deduction.  And nothing precluded the

Commissioner from clarifying at oral argument that, because of his views on section 246, the holding period remained in dispute.

With that said, we are sympathetic to the Commissioner's understanding. We agree that Varian's prior Motion was focused on the effective date issue and did not directly raise section 246.[5] And as the Commissioner points out, in his own response to Varian's Motion, he stated that "[t]he specific amount of the [s]ection 245 [deduction] (if allowed) is one of the issues that, *while in dispute*, does not impact the Court's ability to rule on the cross-motions." Resp't's Br. in Supp. of Mot. for Partial Summ. J. 4 (emphasis added).

We also are mindful that the questions raised here are recurring ones and are present in other cases pending before the Court. Additionally, because there has been no trial and Varian's qualification under section 246 is a pure legal issue with no disputed facts, allowing the Commissioner to raise the matter now does not improperly prejudice Varian or the preparation of its case to date. We will therefore exercise our discretion to overlook any potential forfeiture of the Commissioner's section 246 argument and reach the merits. *See, e.g.*, *Lui v. DeJoy*, 129 F.4th 770, 780–81 (9th Cir. 2025) (exercising the court's discretion to consider an untimely raised issue where the opposing party was not prejudiced); *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) ("[W]e may review an issue if the failure to raise the issue properly did not prejudice the defense of the opposing party.").

B. *Application of Holding Period*

We now consider the merits of the holding period issue. As we have discussed, section 246(c)(1) provides that a deduction is disallowed for "any dividend on any share of stock" if that share of stock is "held by

---

[5] For example, the brief attached to Varian's Motion framed Varian's request as follows:

> Pursuant to Tax Court Rule 121, Varian seeks partial summary judgment on the following legal issues:
>
> I. Whether the plain language of section 245A and section 78 entitled Varian to deduct section 78 dividends under section 245A during the 2018 Tax Year.
>
> II. Whether Treas. Reg. § 1.78-1, which purportedly blocked a section 245A deduction for section 78 dividends during the 2018 Tax Year, is valid.

Pet'r's Br. in Supp. of Mot. for Partial Summ. J. 16.

the taxpayer" for the less than a specified period. *See also* I.R.C. § 246(c)(3) (referring to "the period for which the taxpayer has held any share of stock").

"As always, we start with the text of [the statute]." *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1218 (2023). When the statute does not define a term, "we ask what that term's 'ordinary, contemporary, common meaning' was when Congress enacted [the relevant provision]." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433–34 (2019) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); *see also Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 234 (2018) (reviewed). Here, we first address which shares of stock are at issue, then turn to the requirement that those shares be "held by the taxpayer."

### 1. *"On Any Share of Stock"*

The section 78 dividends in dispute are dividends "on" the shares of Varian's lower tier CFCs. To see why this is so, consider the text of section 78, which we analyzed in detail in our prior opinion. To refresh, section 78 provides:

> [A]n amount equal to the taxes deemed to be paid by [a] corporation under section 902(a)(1) (relating to credit for corporate stockholder in foreign corporation) or under section 960(a)(1)(C) (relating to taxes paid by foreign corporation) for such taxable year shall be treated for purposes of this title (other than section 245) as a dividend received by such domestic corporation from the foreign corporation.

Under its terms, an amount equal to the taxes paid by each CFC (the first-tier and the lower tier CFCs) is treated as a dividend received by Varian "from the foreign corporation"—i.e., the one that paid the tax. Two points are important here: First, Varian is treated as receiving the section 78 dividends directly from each CFC, and not indirectly through the chain of ownership. Second, the amount of section 78 dividend Varian receives from each CFC is equal to the taxes paid by that CFC. Because a section 78 dividend represents the taxes paid by a particular CFC, each section 78 dividend is "on [the] share[s] of stock" of the CFC whose taxes it represents for purposes of section 246(c)(1). Thus, for the section 78 dividends attributable to the lower tier CFCs to be deductible,

the shares of those CFCs must have been "held by the taxpayer" (Varian or a member of its U.S. group) for purposes of section 246(c)(1).

### 2. *"Held by the Taxpayer"*

That brings us to the meaning of the phrase "held by the taxpayer," which is not defined by section 246(c) or related provisions. The Code does, however, define "taxpayer" as "any person subject to any internal revenue tax." I.R.C. § 7701(a)(14). And, although the Code does not provide a general definition of the term "held," it does offer principles for calculating holding periods for certain items of property. *See* I.R.C. § 1223. Of particular relevance for our purposes is whether the term "held" as it is used in section 246(c)(1) requires direct ownership, or whether it can be satisfied by indirect ownership—i.e., ownership through another entity. For the reasons we describe, we agree with the Commissioner that direct ownership is required.

As Varian concedes, the term "hold" is consistently defined as "to have possession or ownership of" or "to possess by a lawful title." Pet'r's Opp'n to Resp't's Mot. for Summ. J. 21; *see also Hold, American Heritage Dictionary* (5th ed. 2018) ("7a. To own or have title to. b. To be in possession of, whether legally entitled or not: *holds an interest in the company*."); *Hold, Black's Law Dictionary* (4th ed. 1957) ("1. To possess in virtue of a lawful title; as in . . . applied to notes, 'the owner and holder.'"); *Hold, Webster's New International Dictionary* (2d ed. 1954) ("10. To own or possess; to be in possession of; to occupy; to derive title to; as, to *hold* office, to *hold* an estate of or from the sovereign.").[6] The Supreme Court has long recognized this meaning. *See McFeely v. Commissioner*, 296 U.S. 102, 107 (1935) ("In common understanding to hold property is to own it.").

An equally longstanding principle treats parent corporations and their subsidiaries as separate taxable entities. *See Moline Props., Inc. v. Commissioner*, 319 U.S. 436, 438–39 (1943); *see also Nat'l Carbide Corp. v. Commissioner*, 336 U.S. 422 (1949). As the Supreme Court has said:

> A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities. See,

---

[6] As we have discussed, the TCJA, which enacted a number of the provisions relevant here and amended section 246(c)(1), was passed and signed into law in 2017. *See* TCJA § 14101(b), 131 Stat. at 2191. Section 246(c) was originally enacted in 1958. Technical Amendments Act of 1958, Pub. L. No. 85-866, § 18, 72 Stat. 1606, 1614–15.

*e.g., First Nat. City Bank* v. *Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 625 (1983) ("Separate legal personality has been described as 'an almost indispensable aspect of the public corporation'"); *Burnet* v. *Clark*, 287 U.S. 410, 415 (1932) ("A corporation and its stockholders are generally to be treated as separate entities"). An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest. See 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 31 (rev. ed. 1999). A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, *it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary.* See *id.*, § 31, at 514 ("The properties of two corporations are distinct, though the same shareholders own or control both. A holding corporation does not own the subsidiary's property").

*Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–75 (2003) (emphasis added).

In *Dole Food*, the Court interpreted statutory text similar to that before us. Specifically, the statute in *Dole Food* described an entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." *Id.* at 473 (quoting 28 U.S.C. § 1603(b)(2)). The Court concluded that a corporation held by a foreign state through intermediary corporations did not qualify, emphasizing that a parent's ownership of a subsidiary does not make the parent the owner of the subsidiary's property.

Absent a specific statutory rule to the contrary, these principles apply with the same force in the tax context. *See, e.g.*, *Moline Props.*, 319 U.S. at 438–39; *see also Ford Motor Co. v. United States*, 908 F.3d 805, 809 (Fed. Cir. 2018) ("Another longstanding legal principle treats parent corporations and their subsidiaries as separate taxable entities."); *First Chi. NBD Corp. v. Commissioner*, 135 F.3d 457 (7th Cir. 1998) (refusing to aggregate stock ownership by affiliated domestic corporations who were members of a consolidated group for purposes of satisfying the 10% threshold in prior section 902), *aff'g* 96 T.C. 421 (1991); *Yamamoto v. Commissioner*, 73 T.C. 946, 962 (1980) (refusing to

attribute stock owned by wholly owned corporation to its 100% shareholder for purposes of section 1239), *aff'd*, 672 F.2d 924 (9th Cir. 1982) (unpublished table decision). There is no contrary rule here.

Indeed, the statutory clues we have are aligned with the Supreme Court's holding. The relevant provision uses the word "held," without elaboration. I.R.C. § 246(c)(1). It also references section 1223, which sets out rules for calculating holding periods for certain property. *See* I.R.C. § 246(c)(3) (specifying that one paragraph of section 1223 does not apply for purposes of determining the holding period under section 246(c)(1), and by implication that the remaining paragraphs do apply). And nothing in that provision suggests that indirect ownership should be counted for purposes of calculating the holding period here. Indeed, several specific rules in section 1223 suggest that the general rule is the opposite. *See, e.g.*, I.R.C. § 1223(1)(B) (establishing a tacked holding period in specific circumstances under section 355 when there may have been prior indirect ownership); I.R.C. § 1223(2) (establishing a tacked holding period when the new owner has a carryover basis).

Congress also provided rules incorporating indirect ownership in the very same provision as section 246(c)(1). Specifically, in section 246(c)(5), Congress set out additional ownership rules a taxpayer must satisfy to deduct dividends under section 245A, including a rule that certain ownership thresholds set by section 245A must be maintained at all times during the required holding period. *See* I.R.C. § 246(c)(5)(B). The statute expressly approves indirect ownership for purposes of meeting these thresholds, in stark contrast to section 246(c)(1). *See* I.R.C. § 246(c)(5)(B) (incorporating the terms "specified 10-percent owned foreign corporation" and "United States shareholder"); *see also* I.R.C. §§ 245A(b)(1), 951(b), 958(a).

For the reasons given by the Supreme Court, therefore, we conclude shares held by Varian's foreign subsidiaries during the relevant period are not treated as Varian's assets and were not held by Varian or members of its U.S. group within the meaning of section 246(c)(1). Varian and its foreign subsidiaries are different taxpayers whose separate identities must be respected. If Congress had intended for the term "held" to include indirect ownership, it could have said so, as it did in at least 22 other instances in the Code and as it did in section 246(c)(5)(B). *See* Resp't's Br. in Supp. of Mot. for Summ. J. 36 n.25 (listing Code provisions that use the term "held"—or "hold" or "holding"—in combination with "directly or indirectly"); *see also PSB Holdings, Inc. v. Commissioner*, 129 T.C. 131, 140–41 (2007) ("Congress

knew how to require a taxpayer to take into account the assets of another taxpayer had Congress intended to include [the Commissioner's] 'look-through' approach in the applicable statutes. See, e.g., sec. 265(b)(3)(E). Congress, however, did not in those statutes provide any aggregation or indirect ownership rule that would apply to the numerator. Instead, Congress referred simply to the obligations of the 'taxpayer' for purposes of making that calculation."). Congress also could have set forth detailed rules for attributing ownership, as it has done in other Code provisions. *See, e.g.*, I.R.C. §§ 267, 318, 958. It did neither, stating simply that the taxpayer must hold the shares. In these circumstances, indirect ownership through a foreign corporation does not suffice.

C.      *Varian's Counterarguments*

1.      *A Dividend "on a Share of Stock"*

Varian first argues that section 246(c) does not apply to its section 78 dividends because such amounts are not "dividend[s] on any share of stock" within the meaning of section 246(c)(1). Essentially, Varian says section 78 dividends are creatures of the Code and so do not have the characteristics of real dividends. For example, Varian asserts, they are not declared, have no ex-dividend date, and are not distributed.

In our first opinion, we rejected a similar argument made by the Commissioner. Specifically, the Commissioner maintained that, although section 78 dividends are dividends "for purposes of [the Code]," they are simply deemed dividends and not real ones. As a result, the Commissioner said, section 78 dividends are not distributions and therefore cannot be deducted under section 245A. *See* TCJA § 14101(f), 131 Stat. at 2192 (providing that section 245A applies to "*distributions* made after . . . December 31, 2017" (emphasis added)). We rejected that argument in part because treating an amount as a dividend for all purposes of the Code means treating the amount as having the characteristics of a dividend—i.e., as being distributed. *Varian*, 163 T.C. at 90–91. Varian was in full agreement with this view. Pet'r's Reply to Resp't's Mot. for Partial Summ. J. 10–11 (citing the definition of "dividend" in section 316 and arguing that "any amount deemed to be a dividend must be deemed to be a distribution as well").

What is good for the goose is good for the gander. Having embraced and benefited from the treatment of section 78 as dividends (and distributions) for purposes of section 245A, Varian cannot

persuasively maintain that they should not also be treated as being paid "on any share of stock." That too is a defining characteristic of a dividend—it is paid to a shareholder based on the shareholder's stock ownership. *See* I.R.C. § 316(a) ("For purposes of this subtitle [which includes section 245A and 246], the term 'dividend' means any distribution of property made by a corporation to its shareholders . . . out of its earnings and profits accumulated after February 28, 1913, or . . . its earnings and profits of the taxable year . . . ."); *Varian*, 163 T.C. at 90–91 (collecting definitions); 11 William Meade Fletcher & Basil Jones, *Fletcher Cyclopedia of the Law of Corporations* § 5318, Westlaw FLTR-CYC (database updated September 2025) ("When a corporation increases its wealth from profitable operations, the shareholders are entitled to a distribution of those corporate profits in proportion to their shares or interest in the corporation. This division or distribution of corporate profits to the shareholders has been called a 'dividend.'"). Thus, a section 78 dividend qualifies as a "dividend on any share of stock" within the meaning of section 246(c)(1).

### 2.  *Meaning of "Hold"*

Next, Varian parses the plain meaning of "hold," arguing that the term is broad enough to encompass indirect ownership. Varian agrees that "hold" generally means "to have possession or ownership of" or "to possess by a lawful title." Pet'r's Opp'n to Resp't's Mot. for Summ. J. 21. But it suggests other potential definitions, including "to keep," "to retain," and to "maintain possession of or authority over." *Id.* And it argues that, as a matter of plain language, one can "hold" something indirectly.

Under the reasoning set out by the Supreme Court in *Dole Food*, 538 U.S. at 474–75, Varian's alternative definitions fare no better than "to own." And, whatever "hold" may mean in the scenarios Varian posits (for example, a shopper holding groceries in a basket), a parent company does not "hold" shares owned by one of its subsidiaries.[7]

Varian points to a few instances of the phrase "held directly" in the Code and argues that the inclusion of "directly" would be redundant if the term "held" on its own excluded indirect ownership. But it is more telling that the Commissioner identified 22 instances of the term "held" (or "hold" or "holding") in the Code in combination with "directly or

---

[7] Again, a specific statutory rule can change this result, but no such rule applies here.

indirectly." Resp't's Br. in Supp. of Mot. for Summ. J. 36 n.25. And, of the two examples Varian offers, one is no longer in the Code, *see* I.R.C. § 860L(a)(1)(C) (repealed 2005), and the other appears in the context of rules for partnerships and S corporations,[8] *see* I.R.C. § 48D(d)(2)(A)(i). Therefore, on balance, Congress's use of the term in other provisions favors our reading. *See, e.g.*, *Whitfield v. United States*, 543 U.S. 209, 216–17 (2005) ("Congress has included an express overt-act requirement in at least 22 other current conspiracy statutes, clearly demonstrating that it knows how to impose such a requirement when it wishes to do so. Where Congress has chosen *not* to do so, we will not override that choice based on vague and ambiguous signals . . . ." (Citation omitted.)).

In addition to the 22 references the Commissioner has identified, the Code in some places includes detailed rules authorizing the indirect and constructive attribution of stock ownership. Such rules generally recite with specificity the circumstances in which they apply. For example, for certain provisions in subchapter C of chapter 1 of subtitle A of the Code, related to corporate distributions and adjustments, section 318 establishes rules that constructively attribute stock ownership among family members and between owners and their entities. Section 958 sets out similar rules that apply for most purposes of subpart F of part III, subchapter N of chapter 1 of subtitle A of the Code, related to controlled foreign corporations. And section 267(c) establishes constructive ownership rules that apply for purposes of disallowing deductions for certain transactions among related parties. *See also* I.R.C. § 707(b)(3) (incorporating the constructive attribution rules of section 267(c)). Congress could have incorporated these rules or adopted similar ones in section 246(c)(1), but it chose not to do so.

Varian invokes these and similar rules and argues that, since the concepts they articulate are incorporated to varying extents in the deductions that section 246(c)(1) disallow—i.e., the deductions under sections 243, 245, and 245A—they must apply for purposes of section 246 as well. Put another way, Varian argues that each of sections 243, 245, and 245A defines the kind of relationship that permits a taxpayer to deduct dividends from a lower tier entity and that section 246(c)(1) simply adds a durational requirement.

---

[8] Unlike corporations, passthrough entities such as partnerships and S corporations typically "pass through" their tax attributes to their owners. And they are treated sometimes as separate entities and sometimes as aggregates of their owners for tax purposes. Thus, clarification regarding indirect ownership is more useful in the passthrough context.

In support of this view, Varian notes that section 243 permits a deduction for "dividends received by one [U.S.] corporation from another [U.S.] corporation in the 'same affiliated group'—which includes related corporations that are indirectly owned by the dividend-receiving corporation." Pet'r's Opp'n to Resp't's Mot. for Summ. J. 22. Similarly, Varian says, section 245 permits a U.S. corporation to deduct certain U.S.-source dividends received from foreign corporations that are owned "directly or indirectly" by the U.S. corporation. *See* I.R.C. § 245(b)(1). And, of course, section 245A permits the deduction of foreign-source dividends from certain foreign corporations, relying on the attribution rules of section 958 to determine the qualifying ownership thresholds. It would make no sense, Varian maintains, to permit a deduction based on indirect ownership in these operative rules, only to disqualify the deduction under section 246 for all dividends except those received from directly held corporations. Varian asserts that such a rule would render the indirect ownership concepts in sections 243, 245, and 245A surplusage. We disagree.

First, nothing in the text of section 246(c)(1) supports this reading. If it had wished to, Congress could have drafted the section 246(c)(1) holding period to require that the relevant corporations maintain the ownership relationships required by sections 243, 245, and 245A for the relevant periods.[9] Instead, it required the taxpayer claiming the deduction to have held the shares, with no indication that indirect or constructive ownership would suffice.

Second, it is worth pointing out that, in the ordinary course, a shareholder receives dividends only from corporations in which the shareholder has direct ownership. The situation Varian is concerned about arises only in the context of a deemed dividend from a lower tier corporation.

Third, our interpretation of section 246(c)(1) does not render indirect ownership rules in other provisions superfluous. A simple example illustrates: Imagine that a corporation (U.S. Co.) directly owns 5% of another corporation (Sub 1) and indirectly owns the remaining 95% through an intermediate corporation. Imagine further that a Code provision allows U.S. corporations to deduct dividends received from corporations in which they own at least a 10% interest, directly or

---

[9] In fact, as we will discuss shortly, Congress did include such a requirement for the section 245A deduction at section 246(c)(5)(B). The requirement is in addition to, and does not supplant, the holding period rule in section 246(c)(1).

indirectly. U.S. Co. would be eligible to deduct the dividends it receives from Sub 1 because its direct ownership interest, combined with its indirect interest, exceeds the 10% threshold. Adding the section 246(c)(1) holding period, which requires direct ownership of Sub 1's shares for a specified time, to this hypothetical would not make the indirect ownership rule superfluous. Without the rule, U.S. Co. would not qualify for any deduction because it would not satisfy the 10% ownership threshold. With the rule, it can deduct the dividends paid by Sub 1.

Fourth, even if this were not the case, the canon against surplusage is not absolute; it cannot overcome clear statutory text. *See U.S. Postal Serv. v. Konan*, 146 S. Ct. 736, 746 (2026) ("The canon against surplusage is subordinate to the 'cardinal canon' that 'a legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))); *see also, e.g.*, *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013); *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004). And section 246(c)(1) clearly provides that shares must be "held by the taxpayer," with no reference to indirect or constructive attribution of ownership. We will not read in those concepts where Congress has omitted them.

3. *Section 246(c)(5)(B)*

Varian next turns to section 246(c)(5), the provision that sets out a stricter holding period when a corporation deducts dividends under section 245A. Specifically, section 246(c)(5)(A) lengthens the period during which shares must be held under section 246(c)(1). And section 246(c)(5)(B) requires that both the recipient and payor corporations maintain their qualifying statuses under section 245A for the duration of the extended holding period. The provision states:

> (B) Status must be maintained during holding period.—For purposes of applying [section 246(c)(1)] with respect to section 245A, the taxpayer shall be treated as holding the stock referred to in [section 246(c)(1)] for any period only if—
>
>> (i) the specified 10-percent owned foreign corporation referred to in section 245A(a) is a specified 10-percent owned foreign corporation at all times during such period, and
>>
>> (ii) the taxpayer is a United States shareholder with respect to such specified 10-

percent owned foreign corporation at all times during such period.

I.R.C. § 246(c)(5)(B).

Varian contends that, in the context of a section 245A deduction, this provision establishes a sufficient condition for satisfying the holding period requirement of section 246(c)(1). Or, in other words, that it replaces the holding period requirement of section 246(c)(1). *See* Pet'r's Opp'n to Resp't's Mot. for Summ. J. 26 ("[T]he right way to understand section 246(c)(5)(B) is that it provides a specific rule that is both necessary and sufficient to satisfy section 246(c)(1).").

But, of course, the phrase "only if" establishes a necessary condition. It does not establish a sufficient condition. *See, e.g.*, *California v. Hodari D.*, 499 U.S. 621, 628 (1991) ("In seeking to rely upon that test here, respondent fails to read it carefully. It says that a person has been seized 'only if,' not that he has been seized 'whenever'; it states a *necessary*, but not a *sufficient*, condition for seizure . . . ."); *Luna-Garcia De Garcia v. Barr*, 921 F.3d 559, 565 (5th Cir. 2019) ("The phrase 'only if' denotes a *necessary*, but not a *sufficient*, condition." (cleaned up)); *Twp. of Tinicum v. U.S. Dep't of Transp.*, 582 F.3d 482, 488 (3d Cir. 2009) ("The phrase 'only if' describes a necessary condition, not a sufficient condition. . . . A necessary condition describes a prerequisite."). Thus, while section 246(c)(5)(B) establishes an additional condition that taxpayers must satisfy to claim a deduction under section 245A, that condition does not supplant the holding period set out in section 246(c)(1). Nor is it duplicative of the holding period, as described in the preceding discussion. Varian's arguments to the contrary are unpersuasive.

### 4.     *Inconsistency with Other Provisions*

Varian's assertion that our interpretation is inconsistent with other Code provisions fares no better. Take, for example, its claim that, under our interpretation, "section 245(b)(1) would allow a deduction for dividends from indirectly owned foreign corporations that section 246(c)(1) would take away . . . inappropriately nullify[ing] a portion of section 245(b)." Pet'r's Opp'n to Resp't's Mot. for Summ. J. 38. Varian is mistaken.

Section 245(a)(1) allows a deduction for a percentage of the U.S. source portion of dividends a corporation receives from a qualified 10% owned foreign corporation. A qualified 10% owned foreign corporation

generally is any foreign corporation "if at least 10 percent of the stock of such corporation (by vote and value) is owned by the taxpayer." I.R.C. § 245(a)(2). Consistent with our reading of section 246(c)(1), Varian appears to agree that this general rule requires direct ownership of the foreign corporation's stock.

Section 245(b)(1), by contrast, allows a more generous dividends-received deduction when the domestic corporation wholly owns "directly or indirectly" the stock of the foreign corporation. That is, the domestic corporation is permitted to deduct a higher percentage of dividends received from wholly owned subsidiaries, accounting for both direct and indirect ownership. But the dividends must still be paid by the subsidiary to the parent to qualify for the deduction. Dividends actually paid to the parent will reflect the parent's direct stockholdings rather than its indirect ownership. This is especially so because amounts treated as dividends by section 78 are *not* deductible under section 245. *See* I.R.C. § 78.

Therefore, contrary to Varian's assertion, section 245(b)(1) relies on indirect ownership to determine whether the ownership threshold has been met (as in our example in Part II.C.2 above) and to determine the percentage of deduction that will be allowed. And our interpretation of section 246(c)(1) is perfectly consistent with its operation.

Varian also invokes section 1248 and a related rule in section 964(e)(4) in support of its view. In short, both provisions treat U.S. shareholders as receiving dividends (or amounts treated as dividends for purposes of section 245A) from their foreign corporations in certain circumstances. The U.S. shareholder may be treated as receiving such amounts from first-tier foreign corporations or lower tier foreign corporations, depending on the facts. And both sections include coordination rules providing that such amounts are potentially eligible for the deduction under section 245A.[10]

---

[10] The coordination rules take slightly different forms, but their approach is similar. *See* I.R.C. § 1248(j) ("In the case of the sale or exchange by a domestic corporation of stock in a foreign corporation held for 1 year or more, any amount received by the domestic corporation which is treated as a dividend by reason of this section shall be treated as a dividend for purposes of applying section 245A."); I.R.C. § 964(e)(4)(A)(iii) ("[T]he deduction under section 245A(a) shall be allowable to the [U.S.] shareholder with respect to the subpart F income included in gross income under clause (ii) in the same manner as if such subpart F income were a dividend received by the shareholder from the selling controlled foreign corporation.").

Varian highlights the coordination rules, arguing that Congress intended the deduction to be available for all amounts treated as received by the U.S. shareholder under the two provisions. It would make little sense, Varian says, for the availability of the deduction to turn on whether the amounts originate in a first-tier or lower tier foreign corporation, which Varian asserts would be the result if we interpreted section 246(c)(1) as requiring direct ownership of shares. The Commissioner disputes Varian's assertions, including its assertions regarding the implications of our reading.

We need not resolve here precisely how section 1248 and section 964(e) interact with section 245A. This case does not involve transactions governed by section 1248 or section 964(e). And, even if Varian's reading of those provisions were correct, it would not change our conclusion here. With respect to an amount treated as a dividend under section 78, section 246(c)(1) mandates a holding period during which shares of stock must be "held by the taxpayer." No rule says that indirect ownership is sufficient, and Supreme Court precedent tells us that parent corporations are not treated as owning shares owned by their subsidiaries. *See Dole Food*, 538 U.S. at 474–75. The rule in section 246(c)(5)(B) establishes an additional necessary condition and does not supplant the general rule in section 246(c)(1). Varian's contrary interpretation would require us to read the word "only" out of section 246(c)(5)(B). This we will not do.

\*     \*     \*

For the reasons we have discussed, shares are "held by the taxpayer" for purposes of section 246(c)(1) only if the taxpayer holds the shares directly. As a result, Varian satisfied the holding period with respect to its first-tier CFCs and did not satisfy the holding period with respect to its lower tier CFCs.

III.   *Section 245A(d)*

We turn now to the parties' computational disagreement with respect to the foreign tax credit disallowance in section 245A(d).

Section 245A(d)(1) provides in relevant part that "[n]o credit shall be allowed under section 901 for any taxes paid or accrued (or treated as paid or accrued) with respect to any dividend for which a deduction is allowed under this section." We held in our prior opinion that, because Varian was allowed a deduction under section 245A with respect to its section 78 dividend, section 245A(d)(1) required a corresponding

reduction to its foreign tax credit. *Varian*, 163 T.C. at 110–12. The amount of the reduction, we said, would be the amount of Varian's deemed paid foreign tax credit that was attributable to the foreign earnings reflected in its deductible section 78 dividend. *Varian*, 163 T.C. at 111–12.

We expressed the amount of the reduction in the following equation:

$$\begin{matrix} Disallowed \\ Foreign\ Tax \\ Credit \end{matrix} = \begin{matrix} Deemed\ Paid \\ Foreign\ Tax \\ Credit \end{matrix} \times \left( \frac{Section\ 78\ gross\text{-}up}{Net\ section\ 965\ inclusion\ +\ section\ 78\ gross\text{-}up} \right)$$

*Id.* at 111. We provided a simplified example of how the equation would apply to a situation in which a U.S. shareholder owned 100% of a foreign corporation with earnings that qualified as subpart F income for U.S. tax purposes. *Id.* We did not provide an example of an inclusion under the Mandatory Repatriation Tax of section 965 (MRT) and so did not opine on the nuances of that provision.

We now consider those nuances. Specifically, the parties dispute the meaning of "net section 965 inclusion" in the denominator of the equation. Varian argues that the proper amount is the amount established in section 965(a) (the "accumulated post-1986 deferred foreign income" of its CFCs) reduced by the amount established in section 965(b) (the "aggregate foreign E&P deficit") with respect to its CFCs. The Commissioner agrees that this computation is the right place to start, but argues that resulting amount must be further reduced by the deduction under section 965(c) to arrive at Varian's "net section 965 inclusion."

We agree with the Commissioner.[11] Before we explain why, we discuss the MRT more generally.

---

[11] As a backup to his substantive position, the Commissioner asserts that Varian forfeited its argument on this issue by not advancing it sooner. We disagree. The parties did not previously raise, nor did our prior opinion specifically address, the computational issues before us here.

A.    *The History of the MRT*

The U.S. Court of Appeals for the Ninth Circuit summarized the history of the MRT in *Moore v. United States*, 36 F.4th 930, 933 (9th Cir. 2022), *aff'd*, 144 S. Ct. 1680 (2024):

> Traditionally, U.S. taxpayers generally did not pay U.S. taxes on foreign earnings until those earnings were distributed to them. This system created a strong incentive for CFCs to separately incorporate their foreign operations, allowing U.S. taxpayers to pay taxes only if and when earnings were repatriated to the U.S. By 2015, CFCs had accumulated an estimated $2.6 trillion in earnings offshore that were not presently subject to U.S. taxation.

> Before 2017, the primary method used to tax a CFC's U.S. shareholders on foreign earnings held offshore was a provision of the tax code called Subpart F. *See* 26 U.S.C. § 951 (2007). Subpart F permitted the taxation of certain types of a U.S. person's CFC earnings when that U.S. person owned at least 10% of a CFC's voting stock. *Id.* Specifically, U.S. shareholders who owned at least 10% of a CFC could be taxed on a proportionate share of particular categories of its undistributed earnings such as dividends, interest, and earnings invested in certain U.S. property. *Id.* § 951(a). . . . [But] active business income attributable to the CFC's own business held offshore . . . was only taxable if and when repatriated to the U.S. through a distribution to U.S. shareholders, loan to U.S. shareholders, or an investment in U.S. property.

> In 2017, Congress passed, and President Trump signed into law, the [TCJA, which] transformed U.S. corporate taxation from a worldwide system, where corporations were generally taxed regardless of where their profits were derived, toward a territorial system, where corporations are generally taxed only on their domestic source profits. As part of this change, the TCJA created a new, one-time tax: the MRT. The MRT modified Subpart F by classifying CFC earnings after 1986 as income taxable in 2017. *See* 26 U.S.C. §§ 965(a), (d) (2017). Under this revised version of Subpart F, U.S. persons owning at least 10% of a CFC are taxed on the CFC's profits

after 1986 at either 15.5% for earnings held in cash or 8% otherwise. *Id.* § 965(c). The MRT imposes this tax regardless of whether the CFC distributed earnings. It also modified CFC taxes going forward: effective January 1, 2018, a CFC's income taxable under Subpart F includes current earnings from its business.

The TCJA also included tax benefits for shareholders of CFCs. When CFCs repatriate untaxed earnings as dividends to U.S. shareholders subject to the MRT, those earnings are generally not taxed. *See* 26 U.S.C. § 245A(a). Further, the TCJA effectively eliminated any other taxes on a CFC's undistributed earnings and profits before 2018.

Essentially, the MRT was a one-time tax on previously untaxed earnings accumulated in CFCs between 1986 and 2017. *Moore*, 144 S. Ct. at 1686 ("As part of the complicated transition to a more territorial system, the [TCJA] imposed [the MRT as] a one-time, backward-looking tax on . . . accumulated income.").

The earnings subject to the MRT were included by U.S. shareholders as subpart F income under section 951(a). Upon being so included, the earnings were subject to the Code's general rules for subpart F income. Thus, U.S. shareholders like Varian that included the earnings in income were entitled to claim the foreign tax credits associated with those earnings. *See* I.R.C. § 960(a)(1); *see also* I.R.C. § 902.[12] And the same U.S. shareholders were required to include as income a section 78 gross-up related to the credits they claimed. I.R.C. § 960(a)(1). It is this amount (i.e., the section 78 gross-up that Varian included related to the MRT and associated foreign tax credits) that has been at issue in this case.

Having provided a general overview, we turn next to the computation of a U.S. shareholder's section 951(a) inclusion under the MRT.

---

[12] Congress repealed section 902 and amended section 960 in 2017, effective for "taxable years of foreign corporations beginning after December 31, 2017, and . . . taxable years of [U.S.] shareholders in which or with which such taxable years of foreign corporations end." TCJA § 14301(a)–(b)(1), (d) 131 Stat. at 2221, 2225.

B.    *The MRT Section 951(a) Inclusion*

As the first step of calculating its section 951(a) inclusion under the MRT, a U.S. shareholder determines the "accumulated post-1986 deferred foreign income" for each of its CFCs. I.R.C. § 965(a). In other words, the U.S. shareholder determines the previously untaxed earnings accumulated in its CFCs between 1986 and 2017. *See* I.R.C. § 965(d).

Next, the U.S. shareholder determines whether any of its CFCs have deficits in their earnings and profits (E&P deficits). I.R.C. § 965(b)(3). If so, the U.S. shareholder subtracts the combined E&P deficits of its CFCs from the accumulated untaxed earnings it identified in the first step of the calculation. I.R.C. § 965(b)(1). The effect is to offset the previously untaxed foreign earnings of the U.S. shareholder's CFCs with the foreign deficits of its CFCs so that only the net amount is subject to tax.[13] Treasury regulations refer to this amount as the "section 965(a) inclusion amount." Treas. Reg. § 1.965-1(b)(1), (f)(38).

The section 965(a) inclusion amount represents the true amount of foreign earnings that are included by the U.S. shareholder and subject to the MRT. But the computation is not yet complete. Recall that Congress decided to tax the earnings subject to the MRT at reduced rates. And, once the earnings are included by U.S. shareholders as subpart F income under section 951(a), they are subject to the Code's general rules for subpart F income, including the standard rates.

Thus, Congress opted to achieve the desired reduced rate for the MRT (15.5% for earnings held in cash and 8% otherwise) by providing a further deduction in section 965(c). The amount of the deduction is whatever amount is mathematically required for a particular U.S. shareholder to achieve the applicable rate (15.5% or 8%). *See* I.R.C. § 965(c)(1) and (2).

A simplified example illustrates the principle. Suppose U.S. Co. owns 100% of a single CFC with a section 965(a) inclusion amount of $100, representing earnings not held in cash. Suppose further that U.S. Co.'s income is subject to U.S. tax at a 20% rate. If U.S. Co. included the full $100 in its subpart F income, the resulting tax would be $20 absent

---

[13] The U.S. shareholder's share of both the earnings and the deficits is determined pro rata based on the U.S. shareholder's ownership of each CFC. I.R.C. § 965(a), (b), (f).

further intervention. To avoid this result, section 965(c) requires U.S. Co. to deduct an amount that will achieve the desired 8% rate.

In this example, an 8% rate applied to the full section 965(a) inclusion amount of $100 would produce tax of $8 (8% × $100). Thus, the target net inclusion for U.S. Co. would be $40—i.e., the amount that, when taxed at 20% (the normal rate), produces tax of $8 (20% × $40).

Having determined the target net inclusion amount, we compute the deduction required to reach that amount by subtracting the target net inclusion amount ($40) from the full section 965(a) inclusion amount ($100). In this example, the deduction required to achieve the target inclusion amount would be $60.

To summarize, U.S. Co.'s section 965(a) inclusion amount is $100 and U.S. Co. deducts $60 under section 965(c) to produce a net income inclusion of $40. This amount is subject to the normal rate of 20%, resulting in tax of $8. This results in the target tax rate of 8% on the full $100 section 965(a) inclusion amount.

More generally, the combined effect of section 965(a), (b), and (c) is to compute a net section 951(a) inclusion that, when taxed at normal rates, has the effect of taxing the full section 965(a) inclusion amount at the applicable MRT rates (15.5% for earnings held as cash and 8% for remaining earnings).

As we have discussed, the parties' dispute is primarily focused on the meaning of "net section 965 inclusion" in the equation we adopted in our prior opinion. More specifically, they disagree as to whether that amount is the full section 965(a) inclusion amount ($100 in our example above) or the net inclusion that results when you reduce that amount by the section 965(c) deduction ($100 − $60 = $40 in our example above).

Before we resolve that dispute, however, we turn to the other two variables in the equation—namely, the foreign tax credits and section 78 gross-up associated with the MRT.

C.     *MRT Tax Credits and Section 78 Gross-up*

Like U.S. shareholders who include other kinds of subpart F income under section 951(a), U.S. shareholders who include amounts related to the MRT under section 951(a) may claim associated foreign tax credits. *See* I.R.C. § 960(a)(1). As a general rule, such U.S. shareholders are treated as paying the foreign taxes that the CFC paid

on the earnings underlying the inclusion.  *See id.*; I.R.C. § 902(a) and (b).  The U.S. shareholder must also include an amount equal to the amount of foreign taxes deemed paid in this manner as dividends under section 78 (section 78 gross-up).

Because the amount of the foreign taxes deemed paid by the U.S. shareholder (together with the section 78 gross-up) depends on the amount of the inclusion under section 951(a), a reduction in the amount of the inclusion reduces the U.S. shareholder's deemed paid foreign taxes and section 78 dividend.  Thus, when a CFC's "accumulated post-1986 deferred foreign income" under section 965(a) is reduced by another CFC's E&P deficit under section 965(b) to determine a U.S. shareholder's section 965(a) inclusion amount, the foreign taxes that the U.S. shareholder is deemed to pay under section 960 are reduced as well, because less foreign income means fewer taxes attributable to that income.

Absent further intervention, there would be no such reduction in foreign taxes deemed paid and the section 78 gross-up related to the deduction under section 965(c).  That is so because, unlike the reduction under section 965(b), the section 965(c) deduction does not directly reduce the inclusion in gross income under section 965(a) and (b) and section 951(a) (i.e., the section 965(a) inclusion amount).  Rather, as we have already explained, section 965(c) authorizes a separate deduction that offsets a portion of the section 965(a) inclusion amount to achieve a lower effective tax rate.  *Compare* Treas. Reg. § 1.965-1(b)(1) ("[A] U.S. shareholder with respect to a [CFC] generally includes in gross income under section 951(a)(1) . . . its pro rata share of the section 965(a) earnings amount of the [CFC] . . . subject to reduction under section 965(b) . . . ."), *with* Treas. Reg. § 1.965-1(c) ("[A] U.S. shareholder is generally allowed a deduction in an amount equal to the section 965(c) deduction amount.").

But if the section 965(a) inclusion amount were offset by a section 965(c) deduction without a corresponding reduction in deemed paid foreign taxes and the section 78 gross-up, those amounts would be out of proportion to a taxpayer's net inclusion and ultimate MRT liability.  Essentially, the taxpayer would receive full credit for foreign taxes deemed paid on the section 965(a) inclusion amount at the normal statutory rates even though the underlying earnings (the section 965(a) inclusion amount) is taxed at significantly reduced rates (15.5% or 8%).

To avoid this result, section 965(g) includes rules that reduce deemed paid foreign taxes and the section 78 gross-up in tandem with the section 965(c) deduction. For deemed paid foreign taxes, section 965(g)(1) provides that no foreign tax credits are allowed "for the applicable percentage of any taxes paid or accrued (or treated as paid or accrued) with respect to any amount for which a deduction is allowed under this section."[14] In other words, to the extent a U.S. shareholder's section 965(a) inclusion amount is offset by a section 965(c) deduction, the foreign tax credits attributable to the offset earnings are disallowed.[15]

A similar rule applies with respect to a U.S. shareholder's section 78 gross-up. Specifically, section 965(g)(4) provides that, for taxes treated as paid by a U.S. shareholder with respect to section 965(a) inclusion amounts, section 78 applies only to a portion of the taxes. That portion is calculated by subtracting the section 965(c) deduction ($60 in our prior example) from the full section 965(a) inclusion amount ($100 in our example) and dividing the resulting amount ($40) by the section 965(a) inclusion amount ($100). Thus, in our simplified example, section 78 would apply to 40% of the foreign taxes deemed paid by U.S. Co. as a result of section 965. Again, the result is that, to the extent a U.S. shareholder's section 965(a) inclusion amount is offset by a section 965(c) deduction, the U.S. shareholder's gross-up under section 78 is commensurately reduced.

D.    *Analysis*

For the most part, the parties agree on how these rules apply to Varian's financial results. They have stipulated the relevant amounts and to the outcome if Varian or the Commissioner should prevail. They even agree on which amounts should be used for two of the three elements of our formula:

---

[14] The "applicable percentage" is provided by formula in section 965(g)(2).

[15] Using the numbers from our example, U.S. Co. had a section 965(a) inclusion amount of $100 and a section 965(c) deduction of $60. Under section 965(g)(1), foreign tax credits associated with approximately $60 of U.S. Co.'s section 965(a) inclusion amount would be disallowed to reflect that, effectively, U.S. Co.'s income inclusion net of the section 965(c) deduction is only $40.

$$
\begin{array}{c}
\textit{Disallowed} \\
\textit{Foreign Tax} \\
\textit{Credit}
\end{array}
=
\begin{array}{c}
\textit{Deemed Paid} \\
\textit{Foreign Tax} \\
\textit{Credit}
\end{array}
\times
\left(
\frac{\textit{Section 78 gross-up}}{\begin{array}{c}\textit{Net section 965 inclusion +}\\ \textit{section 78 gross-up}\end{array}}
\right)
$$

In particular, the parties agree that the Deemed Paid Foreign Tax Credits should be the amount of Varian's deemed paid foreign taxes after reduction by section 965(g)(1)—i.e., after the reduction that corresponds to the section 965(c) deduction. Similarly, the parties agree that the section 78 gross-up should be the amount of Varian's gross-up under section 78 after reduction by section 965(g)(4)—again after the reduction that corresponds to the section 965(c) deduction.[16]

The parties disagree, however, on the meaning of the "net section 965 inclusion." Varian argues that it should equate to the section 965(a) inclusion amount (the earnings determined under section 965(a) less the E&P deficits determined under section 965(b)). The Commissioner contends that, consistent with the other amounts in the formula, the net section 965 inclusion should take into account the section 965(c) deduction. In other words, the Commissioner argues that the net section 965 inclusion should equal the section 965(a) inclusion amount reduced by the section 965(c) deduction.

The Commissioner is correct.

Returning to the text of the statute, the point of the formula is to identify "taxes paid or accrued (or treated as paid or accrued) with respect to any dividend[17] for which a deduction is allowed under [section 245A]." I.R.C. § 245A(d)(1). In other words, the point of the formula is to allocate foreign taxes to the underlying earnings that were subject to foreign tax and identify the portion of those taxes that were attributable to a deductible dividend (here, the section 78 dividend).

In our prior opinion, we illustrated how this would work outside the MRT context with a simple example.

> [A]ssume AmCo was a 100% shareholder of a CFC (CFC 1) that had $100 of earnings in Country A. If Country A taxed

---

[16] In Varian's view, it is "debatable whether the amount in the denominator should be the pre-haircut or post-haircut amount." Pet'r's Opp. to Mot. for Summ. J. 50. But for purposes of the present Motions "to wrap up this case," it has "accepted this aspect of the formula." *Id.* at 51.

[17] Here, the relevant dividend is Varian's section 78 gross-up with respect to its first-tier CFCs.

those earnings at a 20% rate, then CFC 1 would have paid $20 of tax and had $80 of earnings remaining. If we assume the earnings qualified as subpart F income for U.S. tax purposes, then $80 would have been included in AmCo's subpart F income and AmCo would have been treated as paying $20 in tax to Country A under section 960(a). As a result, AmCo would have been entitled to $20 of foreign tax credits and would have been treated under section 78 as receiving a $20 dividend out of CFC 1's earnings. If AmCo claimed a deduction for the $20 section 78 dividend under section 245A, then section 245A(d)(1) would reduce its allowable foreign tax credits as follows:

$$\underset{\substack{\text{(Disallowed}\\\text{FTC)}}}{\$4} \quad = \quad \underset{\substack{\text{(Deemed}\\\text{Paid FTC)}}}{\$20} \quad \times \quad \left( \frac{\$20\ \text{(Section 78 gross-up)}}{\substack{\$100\ \text{(Subpart F inclusion +}\\\text{section 78 gross-up)}}} \right)$$

*Varian*, 163 T.C. at 111 (footnote omitted)

Looking at the example, we see that the amount of disallowed foreign tax credits is $4, or 20% of the total deemed paid taxes. This makes sense: Because the tax rate on CFC 1's earnings was 20%, the section 78 gross-up included as a dividend and then deducted was 20% of CFC 1's earnings. The formula disallows the same percentage of AmCo's foreign tax credits—i.e., the taxes paid with respect to the section 78 dividend.

In the MRT context, the same logic holds under the Commissioner's reading. Using the parties' stipulated numbers, the following amounts are attributable to Varian's first-tier CFCs for the 2018 Year:

| | |
|---|---|
| *Section 965(a) inclusion amount* | $875,377,670 |
| *Section 965(c) deduction* | 449,912,345 |
| *Section 965(a) inclusion amount net of section 965(c) deduction* | 425,465,325 |
| *Foreign tax credits (pre 965(g)(1))* | 125,306,253 |
| *Foreign tax credits (post 965(g)(1))* | 42,801,094 |
| *Section 78 dividend (pre 965(g)(4))* | 125,306,253 |
| *Section 78 dividend (post 965(g)(4))* | 60,903,387 |

Based on these numbers, the rate of foreign tax on Varian's section 965(a) inclusion amount was approximately 12.52% ($125,306,253 ÷ ($875,377,670 + $125,306,253)). As in our example above, the following is the amount of Varian's foreign tax credits that would be disallowed if we treated the section 965(a) inclusion amount as a straightforward subpart F inclusion, ignoring the MRT-specific provisions.

$$\begin{array}{ccccc} \textit{Disallowed} & & & & \\ \textit{Foreign} & = & \$125,306,253 & \times & \left( \dfrac{\$125,306,253}{\$875,377,670 + \$125,306,253} \right) & = & \$15,690,926 \\ \textit{Tax Credit} & & & & \end{array}$$

Note that the percentage of foreign tax credits disallowed again is 12.52% ($15,690,926 ÷ $125,306,253).

Under the Commissioner's proposed computation, in which all amounts in the equation are post-section 965(c), we get the same percentage result:

$$\begin{array}{ccccc} \textit{Disallowed} & & & & \\ \textit{Foreign Tax} & = & \$42,801,094 & \times & \left( \dfrac{\$60,903,387}{\$425,465,325 + \$60,903,387} \right) & = & \$5,359,579 \\ \textit{Credit} & & & & \end{array}$$

Specifically, the percentage of foreign tax credits disallowed is again 12.52% ($5,359,579 ÷ $42,801,094). This is equal to the ratio of the section 78 dividends (reduced by section 965(g)(4)) against the CFCs' pretax earnings (reduced by section 965(c)). In this way, the original ratio is preserved, identifying the foreign taxes attributable to the section 78 dividends (12.52%).

Varian's proposed formula produces a very different result. In it, all the numbers are the same as the Commissioner's numbers (the post-section 965(c) numbers), except that the net section 965 inclusion in the denominator is the full amount of the first-tier CFC's section 965(a) income inclusion, unreduced by section 965(c).

$$\begin{array}{ccccc} \textit{Disallowed} & & & & \\ \textit{Foreign} & = & \$42,801,094 & \times & \left( \dfrac{\$60,903,387}{\$875,377,670 + \$60,903,387} \right) & = & \$2,784,134 \\ \textit{Tax Credit} & & & & \end{array}$$

The section 965(c) deduction is significant, constituting more than half of Varian's section 965(a) inclusion amount. Thus, its omission from the net section 965 inclusion in the denominator drastically reduces the

percentage of Varian's disallowed foreign tax credits, from 12.52% (see above) to 6.5% ($2,784,134 ÷ $42,801,094).

We are hard pressed to see any rationale for Varian's approach, beyond achieving a more favorable result. All the other amounts in the formula, the parties agree, are the post-section 965(c) amounts. Using the post-section 965(c) amount for the net section 965 inclusion compares apples to apples and preserves a meaningful ratio; namely, that approach identifies the percentage of the already-reduced foreign taxes attributable to the already-reduced section 78 dividend. *See* I.R.C. § 965(g)(1), (4). Using the pre-section 965(c) amount for the net section 965 inclusion creates an inflated denominator and a meaningless ratio.

More specifically, on account of section 965(c), the amounts relevant to the formula (the earnings of Varian's first-tier CFCs and the related foreign taxes and section 78 dividends) are each reduced by more than half. Using the post-reduction amounts for some parts of the formula but not others destroys the proportionate relationship between the amounts and results in a disproportionate (and much reduced) disallowance.

E.    *Varian's Counterarguments*

In its Opposition to the Commissioner's Motion, Varian painstakingly explains why the reduced (post-section 965(c)) numbers for foreign tax credits and section 78 dividends must be used in our formula. It is because, Varian says, those amounts capture the actual credits and section 78 dividends that Varian must take into account after application of section 965(c) and the commensurate reductions under section 965(g)(1) and (4). In other words, given the requirements of section 965(c), those are the actual amounts that reflect Varian's liability for the MRT and the associated tax consequences.

But the same logic applies to the net section 965 inclusion. It is the post-section 965(c) amount—and not the section 965(a) inclusion amount—that, when taxed at normal rates, produces the 15.5% and 8% target tax rates under the MRT. In other words, it is the post-section 965(c) amount that matters for determining Varian's MRT liability and the associated consequences, including the reductions under section 965(g)(1) and (4).

The text of section 965 repeatedly establishes the link between section 965(g)(1) and (4) and section 965(c). The multipliers in section 965(g)(1) that haircut a taxpayer's foreign taxes apply with

reference to amounts determined by section 965(c)(1)(A) and (B). Similarly, the reduction under section 965(g)(4) applies a ratio based on the section 965(c) deduction. Text and structure therefore confirm that one cannot ignore section 965(c) when determining the net section 965 inclusion for purposes of section 245A(d). Varian does not offer any persuasive reading of the statute that supports a different view.

The crux of Varian's argument seems to be that, as a technical matter, section 965(c) does not reduce Varian's section 965(a) inclusion amount. Instead, it simply *offsets* that amount through a deduction to achieve the target tax rates.[18] But in this context it is the effect and not the formal mechanism that matters. We can see this in Varian's own analysis. Varian analogizes the haircuts in section 965(g)(1) and (4) to rate reductions—for example, to allowing a foreign tax credit at 30 cents on the dollar or allowing only a 50% deduction for section 78 dividends.[19] But section 965(c) operates in the exact same way with respect to the section 965(a) inclusion amount. It provides a deduction to achieve a lower rate of tax. And Varian does not dispute that the reductions under section 965(g)(1) and (4) are required as a direct result of, and operate in tandem with, the section 965(c) deduction. We are therefore unconvinced by Varian's inconsistent view of which reductions the formula should recognize.

Recall again that the purpose of the formula is to apportion taxes to earnings to identify the foreign taxes paid with respect to (i.e., attributable to) the deductible section 78 dividend. Varian seems to agree that its pre-tax, pre-haircut earnings from its first-tier CFCs of approximately $1 billion (the section 965(a) inclusion amount of $875,377,670 plus the section 78 dividend of $125,306,253) had associated foreign taxes of $125,306,253. That is, Varian seems to agree

_____

[18] At times Varian argues for its position by parsing the phrase "net section 965 inclusion" as if it were statutory text. But this approach is not appropriate given the context here. *See Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022) ("This Court has long stressed that 'the language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute.'" (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979))); *see also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) ("The opinion is not a comprehensive code; it is just an explanation for the Court's disposition. Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration."). The questions the parties present now in their Motions for Summary Judgment were not before us in our prior opinion, and we did not decide them there.

[19] This observation reflects the reality that a rate reduction may be accomplished directly (by lowering the rate) or else by reducing the base subject to tax.

that its first-tier CFCs paid $125,306,253 of foreign taxes with respect to those pre-tax, pre-haircut earnings. Why then, when section 965(c) and section 965(g)(1) haircut the taxes by more than 65%, would we treat the resulting amount ($42,801,094) as still associated with the same pre-haircut earnings, rather than a post-haircut, commensurately reduced amount? Varian has no convincing answer.

Varian offers numerous arguments, but, at bottom, each argument asks us to compare apples to oranges. But apples must be compared with apples. Accordingly, we conclude that the "net section 965 inclusion" in our formula is the section 965(a) inclusion amount with respect to Varian's first-tier CFCs reduced by the associated section 965(c) deduction.

IV.    *Conclusion*

For the reasons stated above, we will deny Varian's Motion for Summary Judgment and grant the Commissioner's Cross-Motion for Summary Judgment.

To reflect the foregoing,

*An appropriate order will be issued.*